# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-KA-01427-SCT

*ROBERT LESTER COX*

*v.*

*STATE OF MISSISSIPPI*

## ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 6/8/2001 |
| TRIAL JUDGE: | HON. GEORGE C. CARLSON, JR. |
| COURT FROM WHICH APPEALED: | TALLAHATCHIE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | DAVID G. HILL |
| | DAVID L. MINYARD |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DEIRDRE McCRORY |
| | SMITH MURPHEY |
| DISTRICT ATTORNEY: | ANN H. LAMAR |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 07/17/2003 |
| MOTION FOR REHEARING FILED: | 03/31/2003 |
| MANDATE ISSUED: | |

**EN BANC.**

**WALLER, JUSTICE, FOR THE COURT:**

¶1.    The motion for rehearing is denied. The prior opinion is withdrawn, and this opinion is substituted therefor.

¶2.    This appeal involves a tragic tale of adultery, jealousy and murder. Robert Lester Cox's wife Marijo ("Jo Jo") had been involved in a romantic relationship with Charles David Rowland for ten years when Rowland was killed. When Rowland, who was always punctual, did not appear for work at the

United States Post Office in Charleston, Tallahatchie County, Mississippi, on April 19, 1999, his supervisor called Jo Jo. That the supervisor first called Jo Jo shows that her relationship with Rowland was well known in the community.

¶3. Jo Jo and a friend left their work at the Regional Mental Health Center and drove to Rowland's property out in the county. They found Rowland's body lying by the Subaru station wagon which he used for his mail route. Law enforcement officials and emergency medical personnel were called, with law enforcement arriving first and securing the area with yellow crime scene tape. The top of Rowland's head had been blown off. A sawed-off 12-gauge pump shotgun lay by Rowland's body.

¶4. Because of the wide knowledge of the affair, the sheriff immediately suspected that Cox had killed Rowland and commenced an extensive investigation. Approximately nine months after Rowland's death, Cox was indicted in the Circuit Court of the First Judicial District of Tallahatchie County, Mississippi, for murder. At the three-week-long trial, Cox advanced the theory that Rowland had committed suicide. Many witnesses testified, often in conflict with other witnesses' testimony. The jury rejected the suicide defense and convicted Cox, who was then sentenced to life imprisonment.

¶5. On appeal Cox raises five issues pertaining to the circumstantial evidence nature of the State's case against him, the sufficiency of the evidence, the denial of a motion for continuance, an evidentiary ruling which admitted hearsay testimony, and the State's remarks during closing argument. In an unusual, but authorized,[1] move, the State has filed a cross-appeal, raising issues about a computer-animated re-enactment shown to the jury and the admission of Rowland's medical records. We affirm the conviction and sentence.

## DISCUSSION

---

[1]*See* Miss. Code Ann. § 99-35-103 (Rev. 2000).

## A. ISSUES RAISED BY COX ON DIRECT APPEAL

**I.     Whether the State, in a case wholly based upon circumstantial evidence, failed to meet its burden of proof when it failed to exclude the reasonable hypothesis that David Rowland committed suicide.**

¶6.     The State's case was based purely upon circumstantial evidence. There was no direct evidence of Cox's involvement in Rowland's death, and Cox did not make any statements to law enforcement officers. The State established motive by testimony that Jo Jo had a long-term affair with Rowland. It established opportunity by showing, through the testimony of several witnesses, that Cox had been "scouting" the area where Rowland lived for several days prior to the shooting, that Cox would have been able to enter and exit Rowland's property without being detected by cutting across the Stubblefield and Buntin properties, that the cigarette butt found on Rowland's property proved that Cox had "staked out" Rowland's cabin, and that Cox had time after the shooting to arrive at the Co-Op where he worked by 7:00 a.m. Finally, the State proved that the sawed-off shotgun which was used to kill Rowland belonged to Cox.

¶7.     Cox contends that the guilty verdict could not rest on this circumstantial evidence because he presented the alternative theory of suicide which was a reasonable hypothesis of his innocence that could not be excluded. Cox presented evidence that Rowland had been depressed and was taking an antidepressant, that the eyewitnesses' identifications of Cox's truck were not positive, that the "hard contact" nature of the gunshot wound could not have occurred unless Rowland himself was holding the gun to his head, that Cox could not have killed Rowland and arrived at his work place within the time frame advanced by the State, that Cox had loaned the sawed-off shotgun to someone else prior to the shooting and had not had possession of the gun in years, and that no blood was ever found on Cox, his clothing, his shoes, or

3

his vehicle. Cox further supports his argument by stating that the forensic pathologist who conducted Rowland's autopsy could not rule out suicide. Cox called three expert witnesses who testified that a bloodstain analysis, gunshot reconstruction and death scene reconstruction showed that Rowland committed suicide, that Rowland was at very high risk for committing suicide, and that one of the side effects of the antidepressant Rowland was taking could cause him to attempt suicide. Cox claims that his wife Jo Jo either planted the cigarette butt or emptied the contents of her ashtray on Rowland's property.

¶8.     To sustain a conviction on circumstantial evidence, every other reasonable hypothesis of innocence must be excluded. "[D]irect evidence is unnecessary to support a conviction so long as sufficient circumstantial evidence exists to establish guilt beyond a reasonable doubt." *Neal v. State*, 805 So. 2d 520, 526 (Miss. 2002) (quoting *Underwood v. State*, 708 So. 2d 18, 35 (Miss. 1998) (quoting *Conner v. State*, 632 So. 2d 1239, 1252 (Miss. 1993), *overruled on other grounds*, *Weatherspoon v. State*, 732 So. 2d 158 (Miss. 1999))). "Circumstantial evidence need not exclude every 'possible doubt,' but only every other 'reasonable' hypothesis of innocence." *Neal*, 805 So. 2d at 526 (quoting *Tolbert v. State*, 407 So. 2d 815, 820 (Miss. 1981)). "Each case must be determined from the circumstances shown in the testimony and the facts must consistently point to but one conclusion--guilt." *Neal*, 805 So. 2d at 526 (quoting *Hilliard v. State*, 749 So. 2d 1015 (Miss. 1999)).

¶9.     In support of his argument Cox cites *Steele v. State*, 544 So. 2d 802, 807-08 (Miss. 1989), where we reversed a conviction based solely upon circumstantial evidence. Steele was caring for a small child who died from massive head injuries. The State's theory was that Steele physically abused the child, causing his death; Steele's theory was that the injuries were caused when the child fell out of the bed. No one but Steele was present at the time the injuries were sustained. Physical evidence did not support either

4

theory. Five physicians testified that the child's injuries were inconsistent with Steele's theory. One physician testified that the injuries could not have been sustained by a fall from a bed. Another physician testified that, while Steele's theory was not *probable*, it was *possible*. We held that the State proved only that the child's injuries were *probably* not caused by a fall from a bed, and that the State failed to prove Steele's guilty because it did not exclude the possibility that the injuries were caused by a fall. The evidence was "legally insufficient to establish anything more than a probability of guilty and did not 'invest mere circumstances with the force of truth.'" ***Id.*** at 809.

¶10.    Here, the State established motive and opportunity. Cox made no attempt to impeach evidence of the existence of his wife's affair with Rowland or that he knew his wife was having an affair with Rowland. Other unimpeached testimony was that within a week or two of Rowland's death, Cox asked several people for the location of Rowland's property or the Stubblefield property, and Cox engaged in threatening behavior to Rowland when he stood outside Rowland's apartment[2] with a gun. Cox's wife had also asked him for a divorce, which he had refused to give her.

¶11.    Cox complains that the death scene was cleaned up before investigators could collect measurements of tire tracks, fingerprints and blood spatter patterns. This claim is addressed in further detail in Issue III below. However, even though this evidence was not available, Cox ignores ample physical evidence at the scene which belies a suicide theory. Before the shooting, Rowland had gotten up, eaten breakfast, dressed, fixed his lunch and gathered up garbage to take to town for disposal. Immediately preceding the shooting, Rowland was loading an ice chest in his car with a bottle of frozen water. While he was loading the ice chest, he set a cup of coffee on the roof of the car. The bag of garbage and the lunch bag were found between Rowland's body and the car. Crediting this evidence and all reasonable

---

[2]Rowland lived in an apartment in Charleston prior to moving out to his cabin in the county.

inferences most favorable to the State, we find that the jury could reasonably exclude the hypothesis that Rowland committed suicide. *See, e.g., **McDonald v. State***, 454 So. 2d 488, 493 (Miss. 1984).

¶12.    Some of the evidence presented was contradicted, but, of course, the jury assigns credibility. A Winston cigarette butt was found behind a bale of hay. It had been put out by someone stepping on it. If Cox stood behind the bale of hay, he would have a clear view of Rowland's cabin. Cox had bought a pack of Winstons at a convenience store between 4:00 and 4:30 a.m. that morning. Testing showed that Cox's DNA was on the cigarette. Jo Jo testified that she routinely emptied her car's ashtray on Rowland's property, but cigarettes put out on an ashtray are usually stubbed out, not stepped on. And even though Cox's DNA was on the cigarette, there was no evidence of how old the cigarette butt was.

¶13.    A trail of clues portrayed a possible route used by Rowland's killer to carry out the murder. An impression in grass on neighboring property showed that a vehicle had been parked there. Dirt was found on a metal gate between the Rowland and the Buntin properties and on a barbed wire fence between the Buntin and Stubblefield properties. A boot print was found on the Stubblefield property. An expert testified that the overall size and shape of the print was consistent with the overall size and shape of the bottom of Cox's boot. Because there was some distortion of the details, he was not able to observe any individual characteristics. He therefore testified that the boot could not be excluded as the source of the print. He further stated that he could not reach a definite conclusion that Cox's boot either made the print or could not have made the print.

¶14.    However, Cox's suicide theory is considerably weakened when one considers the fact that the shotgun which caused Rowland's death *belonged to Cox*, while there were other shotguns and a handgun in Rowland's house which were not used. There was no ammunition in Rowland's house which could have been used in Cox's shotgun. Cox contends that Paul Hughes, Rowland's close friend, saw a 12-gauge

6

pump shotgun in Rowland's house two days before the shooting, but, on cross-examination, Hughes stated that he did not get close enough to the gun to know if it was a 12-gauge, a 16-gauge, or a 20-gauge. Furthermore, Cox's shotgun was sawed-off. Surely Hughes would have noticed a sawed-off shotgun in Rowland's gun cabinet.

¶15.    Cox insists that Rowland was suicidal because he was depressed, anxious about his finances, worried about whether he should go back to his wife or marry Jo Jo, and spreading himself too thin with too many women. He had lost 30 pounds in the months prior to his death and had difficulty sleeping. However, Hughes and Jo Jo testified that Rowland took great pride in the work he had already done on his cabin and property and that he was happy and excited about future work he had planned. Hughes testified that Rowland was very happy being a single man. A recovering alcoholic, Rowland had been sober for several years and attended AA meetings on a regular basis. He had a good salary and benefits from his job with the federal government which gave him plenty of time to work on the property. Although Dr. Abbe Finn, one of Cox's expert witnesses, testified that Rowland was a prime candidate for suicide, she had never treated Rowland, and the people who knew Rowland personally contradicted her testimony. Additionally, the physicians who prescribed the antidepressants to Rowland testified that Rowland was not seriously depressed or suicidal. One of these physicians, T. T. Lewis, M. D., had treated Rowland for 45 years. The other physician, Todd Threadgill, M. D., a gastrologist, saw Rowland only three days before his death.

¶16.    Cox contends that the eyewitnesses' identifications of Cox's truck were not positive and that his son had the truck in question at school with him at Mississippi State University. However, other witnesses testified that they saw Cox sitting in the truck, parked on a road near Rowland's property, or driving the truck.

¶17.    Cox makes much of the fact that the fatal shot was a "hard contact" shot, meaning that the end of the barrel of the shotgun was pressed so tightly against Rowland's face that the skin around the end of the barrel enfolded itself around the end of the barrel.  He contends that a hard contact could not have occurred unless Rowland himself was holding the gun to his face.  But this theory is merely speculative.  The fact is that we do not know how Rowland was shot.  Another plausible theory is that once Rowland saw Cox approaching with the shotgun, he stood still to call Cox's bluff or accept his fate.  Furthermore, the forensic pathologist testified that most gun suicides occur under the chin, in the mouth, or to the side of the head, and that a suicide shot rarely occurred on the forehead.

¶18.    At trial, there was much testimony about the time of the shooting and when Cox arrived at work, and if the interval between the two times was sufficient for Cox to leave Rowland's property, clean up and get to work.  Both the State and Cox's theories were based on one man's testimony that he heard a gunshot about 6:30 that morning, and that Rowland was shot about 6:30.  This testimony is speculative at best.  Even if he heard a gunshot, he could not positively state what time it occurred; he merely judged the time by his regular morning routine.  The only positive proof of a time frame that morning was that Cox was seen in a convenience store around 4:00 or 4:30 a.m., and that he arrived at work around 7:00 a.m.

¶19.    Cox contends that he had loaned the shotgun to someone else before the shooting and had not had possession of the gun in years.  However, after looking at a photograph of the shotgun, the recipient of Cox's largesse affirmatively stated that the shotgun in the photograph was not the shotgun Cox had given him.

¶20.    We find that the jury could conclude that Cox's defense of suicide did not constitute a reasonable hypothesis of innocence, *see **McDonald***, 454 So. 2d at 492, and that the circumstantial evidence used to convict Cox was sufficient to establish guilt beyond a reasonable doubt.

8

## II. Whether the circuit court erred in denying Cox's motion for JNOV.

¶21. To review the denial of a motion for JNOV, we

> must, with respect to each element of the offense, consider all of the evidence-not just the evidence which supports the case for the prosecution in the light most favorable to the verdict. The credible evidence which is consistent with the guilt must be accepted as true. The prosecution must be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. Matters regarding the weight and credibility to be accorded the evidence are to be resolved by the jury. We may reverse only where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty.

*Morgan v. State*, 741 So. 2d 246, 256 (Miss. 1999) (citing *Franklin v. State*, 676 So. 2d 287, 288 (Miss. 1996) (quoting *Wetz v. State*, 503 So. 2d 803, 808 (Miss.1987)).

¶22. Reviewing in the light most favorable to the State the evidence set out in Issue I, we affirm the circuit court's denial of Cox's motion for JNOV.

## III. Whether the State's destruction of physical evidence violated Cox's constitutional right to due process and fundamental right to a fair trial.

¶23. Cox claims that he was denied due process due to the loss of evidence. Specifically, Cox contends that the death scene was insufficiently documented and promptly cleaned up before law enforcement could complete the investigation, that the gun and the body were moved, and that law enforcement destroyed fingerprints on the gun.

¶24. "The State has the duty to preserve evidence, but that duty is limited to that evidence which 'might be expected to play a significant role in the suspect's defense.'" *Northup v. State,* 793 So. 2d 618, 623 (Miss. 2001) (quoting *Tolbert v. State*, 511 So. 2d 1368, 1372 (Miss. 1987) (quoting *California v. Trombetta,* 467 U.S. 479, 488, 104 S. Ct. 2528, 2534, 81 L. Ed. 2d 413, 422 (1984))).

¶25. When a defendant claims he is entitled to a new trial based on the prosecution's having lost or destroyed evidence, we employ a two-part test: First, it must be determined whether the evidence would have played a significant role in the defendant's case. To play a significant role, the exculpatory nature and value of the evidence must have been apparent before the evidence was lost. The second part of the test requires that the defendant have no way of obtaining comparable evidence by other means. *Tolbert*, 511 So. 2d at 1372 (collecting authorities).

¶26. The intentional spoliation or destruction of evidence raises a presumption or inference that the evidence would have been unfavorable to the case of the spoliator: "Such a presumption or inference arises, however, only where the spoliation or destruction was intentional and indicates fraud and a desire to suppress the truth, and it does not arise where the destruction was a matter of routine with no fraudulent intent." *Tolbert*, 511 So. 2d at 1372-73 (citing *Washington v. State*, 478 So. 2d 1028, 1032-33 (Miss. 1985)).

¶27. However, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Wilson v. State*, 574 So. 2d 1324, 1329 (Miss. 1990) (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988)). Here, the record is absolutely devoid of any evidence that the law enforcement officers acted in bad faith.

¶28. The body was slightly moved by the emergency medical technicians. One of the EMTs was a "rookie," and another EMT wanted to show him how, in this type of shooting, blood pooled underneath the skull. A law enforcement officer gave the EMT permission to move the body slightly. The EMT carefully picked up the upper torso so that the rookie could see the pooled blood and then placed it back, taking care to place it as it was before. No fingerprints were found on the shotgun shells or the shotgun

10

itself. One law enforcement official picked the gun up while wearing vinyl gloves. Cox put on evidence that handling objects with vinyl gloves ruined any fingerprints. Also, law enforcement officers returned to the scene a day or two after the murder, washed Rowland's station wagon and scraped the ground with a backhoe, destroying any opportunity to take measurements of blood spatter.

¶29.     An EMT testified that the gun was found lying at Rowland's feet, but pictures showed that the gun was at Rowland's side. If Rowland had committed suicide, the more natural position for the gun would have been in front of the body.[3]  In fact, experts fired the shotgun, and it recoiled directly backwards (to the front of the person firing it) for about 16 feet, so neither position would have been natural if Rowland had shot himself. Either of the shotgun's positions, therefore, would tend to prove that someone had killed Rowland and attempted to stage a suicide. This issue, however, boils down to credibility, and the jury did not believe Cox's suicide theory.

¶30.     Cox complains that the investigation was insufficient, but this claim does not rise to a constitutional level. There is no constitutional requirement that certain investigative procedures be performed at each scene of a suspicious death or that the investigation rise to a certain level of expertise. Furthermore, the sufficiency or insufficiency of a police investigation goes to the weight of the evidence, and it is for a jury to decide what evidence to believe. Several witnesses who testified for Cox stated their opinion that the investigation was inadequate, so the issue was squarely before the jury.

¶31.     This claim is without merit.

### IV.     Whether the circuit court erred in denying a continuance in order for the defense to investigate

[3]Experts testified that after the shot, Rowland would have immediately lost all motor function due to the fact that the brain flew out of the open cranial cavity. This, plus the State's re-enactment of the shotgun's recoil, tend to prove that the shotgun would have landed in front of the body, just as the mostly-intact brain was found at Rowland's feet.

**late-breaking information and incorporate it as an alternate defense theory.**

¶32.    Miss. Code. Ann. § 99-15-29 (Rev. 1994) provides that a court "may grant or deny a continuance, in its discretion," and that a denial of a continuance "shall not be grounds for reversal unless the Supreme Court shall be satisfied that injustice resulted therefrom."  In order for us to reverse, Cox must show that a manifest injustice resulted from the denial of the continuance.  *Lambert v. State*, 654 So. 2d 17, 22 (Miss. 1995).  The decision whether to grant or deny a continuance is a matter left to the sound discretion of the trial court.  *Johnson v. State*, 631 So. 2d 185, 189 (Miss. 1994) (citing *Wallace v. State*, 607 So. 2d 1184, 1190 (Miss. 1992); *Morris v. State*, 595 So. 2d 840, 844 (Miss. 1991); *Fisher v. State*, 532 So. 2d 992, 998 (Miss. 1988)).

¶33.    Prior to trial, Judy Fillyaw had contacted the State and informed it that Jerry Porter was a possible suspect in Rowland's murder.  The State informed the defense and made an investigation.  Upon interviewing Fillyaw and Teresa Porter, Jerry Porter's wife, the State "had a clear belief" that Fillyaw had mistaken Dave Rowland for Dave Nelson, who had allegedly been having an affair with Teresa Porter, and that Jerry Porter was not a possible suspect in Rowland's murder.  Cox filed a motion for continuance, contending that he needed "some time" to "develop" the facts surrounding this incident. The circuit court denied the motion, stating that there had been no discovery violation because the State had notified the defense promptly.

¶34.    We find that no manifest injustice resulted from the denial of the motion for continuance. Cox has not presented any evidence that he was unable to call Fillyaw as a witness at this trial which lasted three weeks. Indeed, Teresa Porter *did* testify for the defense.[4]

> **V.    Whether the circuit court erred in allowing the State to extract hearsay from a witness regarding her having heard Dave Rowland tell her about alleged threats supposedly made to him approximately ten months prior to his death.**

¶35.    The State made a proffer of Linda Meek's proposed testimony as follows: Ten months prior to Rowland's death, while she was speaking to Rowland on the telephone, Rowland told her that he saw Cox standing outside his apartment with a gun. Rowland sounded anxious and told Meek that he was scared. The circuit court allowed her to so testify. Cox challenges the admission of Meek's testimony on two grounds: that it was inadmissible hearsay and that it was not relevant because of the length of time between the event to which she testified and Rowland's death.

¶36.    Relevancy and admissibility of evidence are left, in large part, to the discretion of the trial court. *Mitchell v. State*, 792 So. 2d 192, 217 (Miss. 2001) (citing *Johnston v. State*, 567 So. 2d 237, 238 (Miss. 1990)). However, this discretion must be exercised within the confines of the Mississippi Rules of Evidence. *Id.* Reversal is proper only where such discretion has been abused and a substantial right of a party has been affected. M.R.E. 103(a); *Mitchell*, 792 So. 2d at 217; *Green v. State*, 614 So. 2d 926, 935 (Miss. 1992).

### A.    Hearsay.

---

[4]Porter testified that she had worked with Rowland and that he flirted with her a great deal. She did not testify as to Jerry Porter being a possible suspect.

¶37. After the proffer of Meek's testimony, the circuit court ruled that Rowland's statement to Meek fell within two exceptions to the hearsay rule: Under M.R.E. 803(1), Rowland's statement described or explained an event or condition made while he was perceiving the event or condition or immediately thereafter (a "present sense impression"). Also, under M.R.E. 803(2), Rowland's statement related to a startling event or condition made while Rowland was under the stress of excitement caused by the event or condition (an "excited utterance"). The circuit court cited the comments to Rule 803, stating that the present sense impression exception is "based on the theory that the contemporaneous occurrence of the event and the statement render it unlikely that the declarant made a deliberate or conscious misrepresentation. Spontaneity is the essential factor." M.R.E. 803(1) cmt. Furthermore,

> in many respects the excited utterance exception is similar to the former res gestae rule. The underlying theory of the excited utterance exception is that circumstances may create such an excited condition that the capacity for reflection is temporarily impeded and that statements uttered in that condition are thus free of conscious fabrication.
>
> As in the present sense impression exception, the essential ingredient here is spontaneity. With respect to the time element, the issue is the duration of the excited state. This, depending on exact circumstances of a case, can vary greatly. The declarant need not be a participant but only an observer of the event which triggered the excitement. An excited utterance need only "relate" to the startling event, and, therefore, the scope of the subject matter of the statement may be fairly broad.

*Id.*

¶38. We find that the circuit court did not abuse its discretion in finding that the hearsay was admissible. Rowland contemporaneously related the event to Meek; therefore the statement was a present sense impression. He was anxious and admitted that he was scared; therefore the statement was an excited utterance. The circuit court did not err in admitting the testimony over a hearsay objection.

14

## B. Relevancy.

¶39.   Rule 401 of the Mississippi Rules of Evidence defines "relevant evidence" as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.  Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.  *Baldwin v. State*, 784 So. 2d 148, 156 (Miss. 2001) (citing M.R.E. 403).  Furthermore,

> even when the trial court determines under Rule 403 that prejudice substantially outweighs the probative value of particular evidence, it remains within the court's discretion to determine whether to exclude the evidence, since Rule 403 does not mandate such an exclusion but rather states that the evidence *may* be excluded. . . . [O]ur task as an appellate court reviewing a Rule 403 determination is not to engage anew in the Rule 403 balancing process.  Rather, this Court must simply determine whether the trial court abused its discretion in weighing the factors and admitting or excluding the evidence.

*Baldwin*, 784 So. 2d at 156 (citing *Foster v. State*, 508 So. 2d 1111, 1117-18 (Miss. 1987)).

¶40.   The circuit court ruled that, to the extent that the statements relate to other crimes or wrongs, M.R.E. 404(b) provides that the statements were not ordinarily admissible, but they may have been admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.  It found that the probative value of the statements was not substantially outweighed by the danger of unfair prejudice or confusion of the issues.

¶41.   We find that the circuit court did not abuse its discretion.  Several witnesses testified that Cox was scouting the area around Rowland's land prior to Rowland's death.  One witness testified on one occasion, Cox had been drinking and that, after asking for directions to the Stubblefield place, others would not give

15

him the directions and took him home. The incident to which Meek testified is just one more incident which fits the pattern of Cox's behavior, was not unduly prejudicial to Cox, and did not confuse the issues.

¶42.   This assignment of error is without merit.

> **VI.   Whether the statements made by the State during closing argument regarding Cox's failure to explain the presence of his gun at the death scene constituted unconstitutional comments upon his exercise of his fifth amendment right not to testify.**

¶43.   During closing argument, the State made the following remarks:

> The evidence proves that the defendant's gun was open when the tests show that it won't open. The evidence proves that there's no explanation on how the defendant's gun got to the murder scene other than the defendant placed it there.

> \* \* \*

> Not only can the defendant not explain the presence of his gun at the scene, the defendant can't explain why . . . Dave, who had every reason to live for, . . . would choose to commit suicide, why didn't he use his own gun? It's under the mattress in his bedroom.

¶44.   As the State points out, Cox did not contemporaneously object to these remarks at trial and he is therefore procedurally barred from raising them on appeal. *Slaughter v. State*, 815 So. 2d 1122, 1131 (Miss. 2002). However, addressing the merits, "[w]hat constitutes an improper comment on the defendant's failure to testify is 'to be determined from the facts and circumstances of each case.'" *Jones v. State*, 669 So. 2d 1383, 1390 (Miss. 1995); *Thompson v. State*, 773 So. 2d 955, 961 (Miss. Ct. App. 2000).

¶45.   In *Shields v. State*, 702 So. 2d 380 (Miss. 1997), we cited an Eleventh Circuit circumstantial evidence case. That court held that, in circumstantial evidence cases, the inference of guilt "is at its strongest when the defendant wholly fails to make a credible explanation or makes a demonstrably false

16

explanation." *Cosby v. Jones*, 682 F.2d 1373, 1380 (11th Cir. 1982). In *Shields*, we found that the Eleventh Circuit's holding in *Cosby* "is consistent with our precedents." 702 So. 2d at 383. We have further held that "[t]here is a difference . . . between a comment on [a] defendant's failure to testify and a comment on the failure to put on a successful defense." *Jones v. State*, 669 So. 2d at 1390 (citing *Jimpson v. State*, 532 So. 2d 985, 991 (Miss. 1988)).

¶46. We find that the State's comments on Cox's failure to explain the fact that his shotgun killed Rowland were not improper comments on Cox's failure to testify, but merely comments on Cox's failure to put on a successful defense. As the Eleventh Circuit held, a circumstantial case is built on inferences, and an inference can only be countered by a reasonable explanation, which, in this case, was not given for the shotgun.

### B. ISSUES RAISED BY THE STATE IN ITS CROSS-APPEAL.

¶47. Even though we find that the circuit court committed error in both issues raised by the State, the errors were harmless because we affirm Cox's conviction and sentence.

### VII. Whether the circuit court erred in admitting into evidence certain medical and pharmacological records.

¶48. Prior to trial, Cox acquired Rowland's medical and pharmacological records by subpoena duces tecum without notice to the State or the court. The circuit court denied the State's motion to suppress. The State maintains that Cox never obtained a release from Rowland's family to obtain the privileged documents and that the records were obtained by improperly-issued subpoenae duces tecum inasmuch as no notice was given to the State. Cox used these documents to support his defense of suicide. The documents

17

showed Rowland's medical history and that he was taking antidepressants and had gastrointestinal problems.

¶49.  The State argues that a multi-step analysis should be used in making a determination of this issue: (1) whether the subpoenae duces tecum were improperly issued; (2) whether the records were privileged; and (3) whether the medical privilege must yield to a defendant's right to put on a defense in a criminal case.

(1)  *Whether the subpoenae duces tecum were improperly issued.* Rule 45(d)(2)(A) of the Mississippi Rules of Civil Procedure provides that a copy of a subpoena should be served upon opposing parties immediately after service of the subpoena.[5]  Cox failed to serve copies of the subpoenae to the State.  Furthermore, the comments to M.R.C.P. 45 provide that the trial court "shall quash or modify the subpoena if it . . . requires disclosure of privileged or other protected matter and no exception or waiver applies," presupposing that the trial court would have an opportunity to review the matter before the issuing party has received the documents.  Here, Cox had received the records before either the State or the circuit court knew that the subpoenae had been issued.

(2)  *Whether the documents are privileged.* The medical and pharmacological records were privileged.  The doctor-patient privilege applies in criminal proceedings, and the witness or victim should waive the privilege prior to the admission of such evidence.  *Cotton v. State*, 275 So. 2d 308, 312-13, 313 (Miss. 1996).  Furthermore, the privilege survives the death of the patient.  *See* M.R.E. 503(c).[6]

---

[5]The version of U.R.C.C.C. 2.01 which was in effect at the time of the proceedings herein provided that subpoenas in both civil and criminal forums should conform to M.R.C.P. 45.  U.R.C.C.C. 2.01 was amended April 18, 2002.

[6]M.R.E. 503(c) provides as follows:

**(c) Who May Claim the Privilege.** The privilege may be claimed by the

18

¶50. Cox argues that Jo Jo was present at one of the physical examinations that Rowland underwent; and therefore, the records from that examination were not privileged. Whether the presence of a third party at a medical examination waives the privilege is an issue of first impression in Mississippi. A Colorado court held that if the patient intends for the examination to be confidential, the privilege is not waived when a third person is present for the examination. *People v. Deadmond*, 683 P.2d 763, 771 (Colo. 1984) (Even though a patient was so loud during an examination in an emergency room that others could hear his complaints, he did not intend to waive the privilege and therefore medical records were inadmissible.) Indeed, M.R.E. 503(a)(4) provides that "[a] communication is *'confidential'* if not intended to be disclosed to third persons, except persons present to further the interest of the patient in the consultation, examination, or interview, . . . ." The notes of the physician who examined Rowland indicate that he relied upon Jo Jo in developing Rowland's medical history. Therefore, the records were confidential even though Jo Jo was present.

(3)     *Whether the medical privilege should yield to a criminal defendant's right to present a defense.* The Court of Appeals has held that a criminal defendant's right to confront the witnesses against him does not override a confidential medical privilege. *Windham v. State*, 800 So. 2d 1257, 1260 (Miss. Ct. App. 2001).

> There simply is no recognized principle of law by which such recognized privileges as the attorney-client privilege, the priest-penitent privilege or the privilege against self-incrimination can be ignored and the evidence compelled despite the assertion of those privileges no matter the urgency of a criminal defendant's need for the protected information.

patient, his guardian or conservator, or the personal representative of a deceased patient. The person who was the physician or psychotherapist at the time of the communication is presumed to have authority to claim the privilege but only on behalf of the patient.

*Id.* at 1261-62.

¶51.    We agree with the Court of Appeals' rationale, in general, but note that, in ***Windham***, the defendant sought a witness' medical records for the purpose of impeaching the witness. The witness was not the victim and had not placed his medical condition at issue. With respect to Rowland, the State's own Crime Lab report indicated the presence of Citalopram (Celexa) in Rowland's urine. The relevance of the presence of an antidepressant in the victim's urine is irrefutable where Cox's defense was that Rowland committed suicide. However, allowing access to all of Rowland's medical records was error, though harmless under the circumstances.

¶52.    Should this issue arise in the future, medical evidence pertaining to a victim may be secured and admissible in limited situations where the medical evidence is relevant, material and exculpatory. *See* ***People v. Bean***, 560 N.E.2d 258, 268 (Ill. 1990) (Medical records not material to defense inadmissible); ***State v. Stuck***, 434 N.W.2d 43, 54 (S.D. 1988) (Denial of access to privileged medical records upheld where defendant was not denied any material information, his defense was not prejudiced in any manner, and the victim's physical or mental health was not at issue).

¶53.    Because the doctor-patient privilege should be inviolate in most circumstances, we suggest certain actions, in addition to the guidelines of U.R.C.C.C. 2.01, to be taken by trial courts to control a criminal defendant's access to privileged information. An in camera review by the court of the medical records to determine if the evidence is material, relevant and exculpatory would be appropriate. *See* ***People v. Bean***, 560 N.E.2d at 269. If the circuit court finds that the records are admissible, the records should be redacted as much as possible to show only the evidence which is relevant and exculpatory. *See* ***id.*** *See also* ***Pennsylvania v. Ritchie***, 480 U.S. 39, 58-61, 107 S. Ct. 989, 1002-04, 94 L. Ed. 2d 40, 58-60

(1987) (While a defendant has a constitutional right to all material information contained in statutorily privileged records, he had no right to review the full records himself or through his attorney; instead, the trial judge alone should review the records in camera and should then disclose only material information.).

¶54. Here, the proper procedure for obtaining the subpoenae duces tecum was not followed and the medical records were admitted. However, any error in admitting the records was harmless because the jury convicted Cox and did not give credence to the suicide defense.

### VIII. Whether the Circuit Court Erred in Allowing Cox's Expert Witness to Give Opinions on Certain Matters.

¶55. Mike West, D.D.S., testified on behalf of Cox as an expert witness in, inter alia, crime scene reconstruction, ballistics and blood spatter. We find the admission of his opinions harmless under the circumstances and decline the State's request that we adopt more stringent standards for the admission of expert opinions because this issue is better addressed in making modifications to the Mississippi Rules of Evidence.

### IX. Whether the circuit court erred in admitting into evidence a computer-generated animation.

¶56. The State asserts that the circuit court erred in admitting a computer-generated animation created by Dr. West and others. The animation demonstrates Dr. West's opinion as to how Rowland's alleged suicide could have occurred. Because no measurements were made at the scene, Dr. West testified that the animation was based on his study of the case, including pictures, investigative reports, the weapon, the crime scene, the vehicles, etc. The State filed a motion in limine to suppress the animation, and at the hearing thereon, Cox argued that the animation would only be used as demonstrative evidence and would not be offered into evidence. Cox also informed the circuit court that "all of Dr. West's opinions, except

21

for when he reconstructed the scene and we have this animation, comes from only the State's evidence."

The circuit court ordered Cox to

> provide full and complete disclosure of any and all underlying data and scientific principles relating to "utilize computer analysis, enhancements and animation" of the proposed suicide video. The disclosure by the defendant must include but is not limited to the mathematics, physics, programming, hardware or software and any supporting documentation or studies used to create or support the animation.

Cox responded that a Bill Maxwell assisted West in the generation of the animation, but, as the State notes,

> no further information on Maxwell was disclosed. The defendant's response failed to outline the specific, scientific data including the measurements which were used to create the animation. It merely listed various software programs without any accompanying explanation of their application and no description of hardware. Bill Maxwell was never listed as a potential defense witness. Bill Maxwell never provided any form of signed written report, and neither did any of the defendant's other expert witnesses in this case. Finally, neither Bill Maxwell, nor any []other computer person, nor West, ever testified during trial as to the software or hardware actually used to make the animation. No one testified to the specific mathematical data used to manufacture this video animation prior to it being shown to the jury.

¶57. At a hearing on the State's motion to suppress, an FBI Visual Information Specialist Examiner testified that, because of current technologies in computer animation, it was possible to create an animation showing literally anything as "real," when it was not based on any facts. Any computer animation which was not based on actual, physical measurements from the crime scene was mere speculation. Other jurisdictions have addressed this issue and found, inter alia, that the animation *must* be based on scientific, identifiable, and objective facts. *See, e.g., **Pierce v. State***, 718 So. 2d 806 (Fla. Dist. Ct. App. 1997) (The foundation for admission of a computer-generated animation must include specific physical measurements from the scene and testimony as to what software, process and data were used.); ***Clark v. Cantrell***, 529 S.E.2d 528 (S.C. 2000) (A computer-generated animation is admissible as

demonstrative evidence when the proponent shows that the animation is authentic, relevant, a fair and accurate representation of the evidence to which it relates; and its probative value substantially outweighs the danger of unfair prejudice, confusing the issues, or misleading the jury.); *State v. Farner*, 66 S.W.3d 188 (Tenn. 2001) (To be admissible, a computer-generated animation must be relevant and fair and accurate, and its probative value must outweigh its prejudicial effect.). We agree.

### X. Whether the Computer Animation Should Have Been Given to the Jury for Consideration During their Deliberations.

¶58. Cox argues that the animation was nothing more than demonstrative evidence which helped to explain his testimony. Demonstrative evidence is admissible if it is necessary and relevant to a fact at issue. *Murriel v. State*, 515 So. 2d 952, 956 (Miss. 1987). Substantive evidence is evidence which is offered for the truth of the matter asserted. *Marcum v. Miss. Valley Gas Co.*, 587 So. 2d 223, 225 (Miss. 1991).

¶59. The State urges us to adopt the rationale of other jurisdictions where the courts have held that evidence which is admitted for demonstrative purposes only should not be received in evidence and should not be available to the jury for use during deliberations. *See* U.R.C.C.C. 3.10 ("The court shall permit the jury, upon retiring for deliberation, to take to the jury room the instructions and exhibits and writings which have been received in evidence."). In the case sub judice, even though Cox argues that it was only used as demonstrative evidence, the animation was admitted as an exhibit and was included in the evidence which was given to the jury to consider during its deliberations. We agree with the State's argument and find that evidence which is admitted for demonstrative purposes only *should not* be given to the jury for its consideration during deliberations.

¶60. Any error committed by the circuit court in admitting the animation and allowing the jury to consider the animation during deliberations. Furthermore, any error was harmless because Cox was convicted was harmless. However, the law pertaining to computer animations and demonstrative evidence announced today will be prospectively applied in both criminal and civil cases.

## CONCLUSION

¶61. Because Cox's assignments of error are without merit and because any error made by the circuit court in admitting privileged records, allowing certain expert testimony, and allowing the jury to consider demonstrative evidence is harmless, we affirm Cox's murder conviction and life sentence.

¶62. **CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

**PITTMAN, C.J., McRAE AND SMITH, P.JJ., COBB, DIAZ, EASLEY AND GRAVES, JJ., CONCUR. CARLSON, J., NOT PARTICIPATING.**