BRIDGES, P.J.,
for the Court.
PROCEDURAL HISTORY
¶ 1. On May 20, 2003, the Justice Court of Newton County found Michael Yates guilty of telephone harassment. Yates appealed the justice court verdict. The matter went before the Newton County Circuit Court for a trial de novo. A jury sitting before the Newton County Circuit Court found Yates guilty of the crime of telephone harassment, a violation of Section 97-29-45(1)(a) of the Mississippi Code(2000). The circuit court sentenced Yates to a six month sentence in the county jail. Following his unsuccessful motion for new trial, Yates appeals and seeks resolution of the following issues, listed verbatim:
I. WHETHER THE COURT ERRED IN ADMITTING EVIDENCE OF PHONE RECORDS SECURED BY THE STATE BY A MEANS OTHER THAN BY THE SUBPOE *1124 NA DUCES TECUM RULE OF UNIFORM COUNTY AND CIRCUIT COURT RULE 2.02.
II. WHETHER THE COURT ERRED IN FAILING TO GRANT A MISTRIAL AFTER EVIDENCE WAS ADMITTED BEFORE THE JURY IN A DISCOVERY VIOLATION OF THE MISSISSIPPI UNIFORM RULES OF CIRCUIT AND COUNTY COURT PRACTICE, 9.04.
Finding no error we affirm.
BACKGROUND
¶ 2. During the spring of 2003, Bethany Garrison studied at East Central Community College. While enrolled, Bethany lived with her mother and maintained employment at Anderson’s Hospital in Meridian. Prior to April 1, 2003, Bethany received a threatening phone call at work.
¶ 3. Bethany had “Caller ID” and an “Anonymous Call Rejection” feature equipped on her home telephone. “Caller ID” operates when one receives an incoming call. The Caller ID feature displays the telephone number corresponding to most incoming calls. However, a caller who wants to circumvent Caller ID may do so by entering a particular sequence of numbers. Afterwards, that caller’s number will not appear on a recipient’s Caller ID. If a recipient wishes to avoid calls from such an unidentified caller, one may use a service called “Anonymous Call Rejection.” That service forces callers who block their names and numbers to unblock them before calling.
¶ 4. On April 1, 2003, Bethany got out of school around 2:00 p.m. Since she was not scheduled to work that day, she spent the remainder of the day at home. Bethany’s Caller ID recorded four anonymous calls on April 1. Bethany called Anderson’s Hospital to determine if the anonymous calls were somehow related to the threatening calls she previously received at work. An upset co-worker informed Bethany that someone called Anderson Hospital and threatened to harm Bethany’s co-worker unless Bethany’s co-worker told the caller where he could find Bethany. After she hung up, Bethany called her mother, and Bethany’s mother contacted the Newton County authorities.
¶ 5. Joedy Pennington, a deputy with the Newton County Sheriffs Office, went to Bethany’s home to investigate the matter. Deputy Pennington arrived at Bethany’s house around 5:00 p.m. Around 6:00 p.m., Bethany received another anonymous telephone call. Deputy Pennington listened in on another extension while Bethany answered the call.
¶ 6. The caller, a male, promised that he would not harm Bethany as long as she answered his questions. The caller then asked Bethany various obscene sexual questions, which do not bear repeating. The caller also identified himself as the perpetrator of several rapes and murders that occurred in Louisiana.[1] He told Bethany that he had moved to Mississippi, but he would not harm her if she answered his questions.
¶ 7. Bethany asked the caller, “why are you doing this?” The caller responded, “because I can.” As Bethany became increasingly upset, Deputy Pennington asked the caller, “would you like to hurt me too?” The caller’s response suggested that the caller would, in fact, be interested *1125 in harming Deputy Pennington. Deputy Pennington informed the caller that he could find Deputy Pennington at the Newton County Sheriffs Office. The caller hung up. That was the last time Bethany received such a phone call.
¶ 8. Authorities traced the number from which the anonymous calls were placed. Deputy Pennington learned that the obscene phone calls originated from a telephone number owned by Harmony Jo Col-yer, from Florence, Mississippi. Harmony dated and periodically cohabited with Michael Yates. The Newton County Justice Court entered an order directing the Alltel telephone company to produce Harmony Colyer’s telephone records. Deputy Pennington, having talked to Yates numerous times, recognized Yates’s voice.
¶ 9. On May 20, 2003, the Justice Court of Newton County found Yates guilty of telephone harassment. Yates appealed the justice court verdict. The matter went before the Newton County Circuit Court for a trial de novo. See URCCC 12.02(A).
¶ 10. At trial, the prosecution called Deputy Pennington and Bethany as witnesses. Deputy Pennington’s testimony, aided by Harmony’s telephone records, demonstrated that someone using Harmony’s home phone called Bethany at 5:22 p.m., 5:28 p.m., 5:40 p.m., 6:03 p.m., and 6:17 p.m. Bethany testified as to the events of April 1. Further, Bethany testified that she did not know Yates prior to the matter at hand. After the State rested its casein-chief, Yates entered an unsuccessful motion for a directed verdict. Subsequently, Yates presented his case.
¶ 11. Yates presented an alibi defense. His entire defense rested on the proposition that he did not call Bethany’s house, and could not have called from Harmony’s house because he and Harmony were at his mother’s house at the times Bethany received the pertinent phone calls. Yates called four witnesses during his case-in-chief: Peggy Myrick, Jean Bush, Rita Yates, and Harmony.
¶ 12. Peggy Myrick is Yates’s mother. Peggy testified that Yates could not have used Harmony’s phone to call Bethany at 6:17 p.m. because Yates was with Peggy at that time. Peggy testified that Yates lived with her at her home in Laurel, Mississippi, but Yates also periodically stayed at Harmony’s house. Further, Peggy testified that Yates was at her house between 6:20 and 6:30 p.m. on April 1, 2003. According to Peggy’s testimony, Harmony and Yates stayed with her overnight and left for Vermont the next morning.
¶ 13. On cross-examination, the prosecution pointed out that Harmony’s phone records indicated that someone at Harmony’s house called Peggy’s house at 6:56 p.m. Peggy responded that Yates did not call her. The prosecution continued questioning Peggy about Harmony’s phone records.
The State: Well, who was it that called you at 6:56 on April 1st?
Peggy: I did not talk on the phone on April 1st to that number.
The State: You didn’t talk on the phone?
Peggy: No, I didn’t.
The State: Why is it that it shows that there was a call duration of approximately 1 to 2 minutes from that phone call?
Peggy: I have no idea.
The State: You don’t have any idea? It’s kind of odd—
Peggy: No. I have no idea.
The State: It’s kind of odd that somebody would call you from Florence when Michael and both your current daughter-in-laws were there with you. I find that very strange?
*1126 Peggy: Nobody called my house that night. That I — I never answered the phone.
Additionally, the prosecution pointed out that the phone records indicated that someone at Harmony’s house called Yates’s father, Larry Yates, at 8:42 p.m., during the time Peggy said Yates would have been with her. Again, Peggy could not explain the inconsistency.
¶ 14. Jean Bush is a friend of Peggy’s. Jean’s testimony bolstered Peggy’s testimony and Yates’s alibi theory. Jean testified that she talked to Yates between 6:15 p.m. and 6:30 p.m. on April 1, 2003. On cross-examination, Jean elaborated that, contrary to Peggy’s testimony, that she did not talk on the phone, Jean called Peggy’s house and heard laughter in the background. Jean then asked Peggy if it was Yates that she heard laughing. Peggy put Yates on the phone so Jean could speak to Yates. Like Peggy, Jean could not explain the phone call placed from Harmony’s phone to Peggy’s phone during the time Peggy testified that Yates was with her.
¶ 15. Rita Yates is Yates’s ex-wife. At the time of the trial, Rita lived in Union, Mississippi. According to Rita’s testimony, she traveled to Laurel to visit Peggy and drop off her and Yates’s son. After Rita traveled back to her home, she called Peggy to let her know that she made it back home safely. Again, contrary to Peggy’s testimony, Rita testified that she called Peggy around 6:30 p.m. and spoke to Yates during the call. Thus, Rita’s testimony tended to bolster-Peggy’s testimony and Yates’s alibi theory.
¶ 16. Harmony’s testimony also bolstered Yates’s alibi defense. Harmony testified that Yates kept some clothes at her house but he primarily lived with his mother. Harmony added that her landlord and two of her best friends had access to her house. According to Harmony, she and Yates left her house in Florence Mississippi at 10:00 a.m. or 10:30 a.m., stopped in Conehatta, Mississippi to visit Yates’s father, ate lunch, ran some errands in Union, and proceeded to Peggy’s house in Laurel. Harmony testified that they arrived at Laurel around 6:15 p.m. or 6:30 p.m.
¶ 17. Examining her phone records, Harmony testified that there were 122 phone calls placed from her phone after she and Yates left for the day. Harmony testified that she could not explain those phone calls, but she paid her bill without question. That is, she was not alarmed or concerned that someone broke into her house and spent ten hours making over one hundred phone calls, including calls to Yates’s mother and father. Following Harmony’s testimony, the defense rested.
¶ 18. At that point, the prosecution presented its rebuttal. The prosecution called Jackie Knight, Sheriff of Newton County. Sheriff Knight testified that on April 8, 2003, he interviewed Harmony regarding the April 1, 2003 phone calls. According to Sheriff Knight, Harmony told him that she and Yates were the only people at her house during the times the phone calls were placed to Bethany on April 1, 2003. After Sheriff Knight testified, the prosecution closed its rebuttal.
¶ 19. Following the prosecution’s rebuttal, Yates presented surrebuttal testimony from Harmony. Harmony testified that she did take part in an interview with Sheriff Knight. Further, Harmony testified that she mistakenly told Sheriff Knight that she and Yates were at her house around 5:30 p.m. on April 1, 2003. She explained her previous inconsistent statement to Sheriff Knight when she testified that she was confused about the dates and what she had been doing on those dates. After Harmony’s testimony, Yates closed his surrebuttal.
*1127 ¶20. The jury deliberated and found Yates guilty as charged.
ANALYSIS
I. WHETHER THE COURT ERRED IN ADMITTING EVIDENCE OF PHONE RECORDS SECURED BY THE STATE BY A MEANS OTHER THAN BY THE SUBPOENA DUCES TECUM RULE OF UNIFORM COUNTY AND CIRCUIT COURT RULE 2.02.
¶ 21. This issue concerns the prosecution’s acquisition of Harmony’s telephone records. The prosecution obtained Harmony’s phone records by way of an order from the justice court. That is, the justice court ordered the phone company to turn over Harmony’s telephone records corresponding to the time frame of the offense. Pre-trial, Yates objected ore ten-us and argued that the justice court’s order to produce documents ignored Rule 2.01 of the amended Mississippi Uniform Rules of Circuit and County Court Practice. Rule 2.01 governs subpoenas duces tecum.
¶ 22. On appeal, Yates repeats his complaint. Elaborating, Yates says that he is unaware of any rule that grants subpoena duces tecum power to a justice court. According to Yates, he received no notice of a hearing concerning the request for Harmony’s telephone records. Yates reasons that since he received no notice of the hearing, a violation of URCCC 9.04 occurred. Yates argues that because the trial in the circuit court was a trial de novo, it is irrelevant that the telephone records were obtained when this matter was before the justice court. Yates concludes that the prosecution should have been precluded from introducing Harmony’s telephone records.
¶ 23. To be clear, the prosecution obtained Harmony’s telephone records during the investigative process. Once authorities discovered the number that corresponded to the phone from which Bethany received the relevant calls, authorities obtained an order directing the Alltel telephone company to produce a record of telephone calls made from Harmony’s telephone. Authorities charged Yates after they obtained Harmony’s phone records. Thus, the process of obtaining Harmony’s phone records occurred prior to charging Yates with telephone harassment.
¶ 24. The standard of review for the admission or exclusion of evidence is abuse of discretion. Harris v. State, 892 So.2d 830 (¶ 11) (Miss.Ct.App.2004). This Court will reverse a case only if the admission or exclusion of evidence causes a party to suffer prejudice and harm or some adverse affect of a party’s substantial rights. Farris v. State, 764 So.2d 411 (¶ 57) (Miss.2000).
¶ 25. First and foremost, Yates has no standing to object to the prosecution’s acquisition of Harmony’s phone records. Peggy and Harmony both testified that Yates’s primary residence was at Peggy’s house, not Harmony’s. Nothing in the record indicates that Yates had any ownership interest in Harmony’s telephone records. If a person denies ownership or possession of property, he has no standing to complain that a search was not lawful. See Waldrop v. State, 544 So.2d 834, 837 (Miss.1989). Following a similar rationale, Yates has no standing to complain of the prosecution’s acquisition and submission of telephone records corresponding to a telephone number in which he had no ownership interest.
¶ 26. Second, Yates was not surprised by the prosecution’s use of Harmony’s telephone records. During arguments on *1128 his ore terms motion, Yates’s attorney stated, “I’ve had the records for months and months, for that matter. And there’s no surprise.” Accordingly, Yates was not prejudiced by the evidence due to surprise when the prosecution utilized Harmony’s phone records.
¶ 27. Finally, Yates did not cite authority that says a justice court may not order a telephone company to produce telephone records. While Yates did cite Robinson v. State, 875 So.2d 230 (Miss.Ct.App.2004) and Cox v. State, 849 So.2d 1257 (Miss.2003), both Robinson and Cox address subpoenas of privileged medical records. Failure to cite authority for an argument causes operation of a procedural bar to consideration of that issue. Turner v. State, 721 So.2d 642 (¶ 20) (Miss.1998). For the foregoing reasons, Yates’s argument is not well-taken. We affirm the decision of the circuit court.
II. WHETHER THE COURT ERRED IN FAILING TO GRANT A MISTRIAL AFTER EVIDENCE WAS ADMITTED BEFORE THE JURY IN A DISCOVERY VIOLATION OF THE MISSISSIPPI UNIFORM RULES OF CIRCUIT AND COUNTY COURT PRACTICE, 9.04.
¶ 28. This issue concerns Sheriff Knight’s rebuttal testimony. Sheriff Knight used his notes during his rebuttal testimony. At trial, Yates objected to Sheriff Knight using his interview notes during his testimony. Yates argued that the prosecution failed to tender Sheriff Knight’s notes during discovery. On appeal, Yates claims that Sheriff Knight’s rebuttal testimony created a violation of Rule 9.04 of Mississippi’s Uniform Rules of Circuit and County Court Practice.
¶ 29. URCCC 9.04 pertains to discovery. Rule 9.04(A) details the prosecution’s duty to provide the defendant with:
1. Names and addresses of all witnesses in chief proposed to be offered by the prosecution at trial, together with a copy of the contents of any statement, written, recorded or otherwise preserved of each such witness and the substance of any oral statement made by any such witness;
2. Copy of any written or recorded statement of the defendant and the substance of any oral statement made by the defendant;
3. Copy of the criminal record of the defendant, if proposed to be used to impeach;
4. Any reports, statements, or opinions of experts, written, recorded or otherwise preserved, made in connection with the particular case and the substance of any oral statement made by any such expert;
5. Any physical evidence and photographs relevant to the case or which may be offered in evidence; and
6. Any exculpatory material concerning the defendant.
URCCC 9.04(A)(1-6). Additionally, “[u]pon a showing of materiality to the preparation of the defense, the court may require such other discovery to the defense attorney as justice may require.” URCCC 9.04(A).
¶ 30. Under the circumstances, Yates is not entitled to relief under URCCC 9.04. Clearly, Yates’s complaint does not involve his criminal record under URCCC 9.04(A)(3), or an expert’s statement, report, or opinion under URCCC 9.04(A)(4). Likewise, Yates’s argument does not involve physical evidence or photographs under URCCC 9.04(A)(5). Since Sheriff Knight’s testimony was not “exculpatory,” Yates has no argument under URCCC 9.04(A)(6). At best, Yates could only put *1129 forth a meritorious argument for relief under URCCC 9.04(A)(1) or (2).
¶ 31. URCCC 9.04(A)(1) states that the prosecution must provide the defense with the “[n]ames and addresses of all witnesses in chief proposed to be offered by the prosecution at trial, together with a copy of the contents of any statement, written, recorded or otherwise preserved of each such witness and the substance of any oral statement made by any such witness.” (emphasis added). Sheriff Knight testified during the prosecution’s rebuttal. Accordingly, Yates is not entitled to relief under URCCC 9.04(A)(1).
¶ 32. URCCC 9.04(A)(2) directs the prosecution to provide the defense with “any written or recorded statement of the defendant and the substance of any oral statement made by the defendant.” (emphasis added). Under URCCC 9.04(A)(2), the prosecution had to provide Yates with any statement in their possession made by Yates. Here, Yates complains of a discovery violation based on the prosecution’s failure to tender portions of Sheriff Knight’s interview with Harmony. Thus, Yates’s complaint focuses on the failure to tender a statement made by one of his witnesses, rather than a statement of Yates. As such, Yates is not entitled to relief under URCCC 9.04(A)(2). Having found that Yates is not entitled to relief under any provision of URCCC 9.04(A), Yates’s final contention lacks merit.
¶ 33. THE JUDGMENT OF THE NEWTON COUNTY CIRCUIT COURT OF CONVICTION OF TELEPHONE HARASSMENT AND SENTENCE OF SIX MONTHS IN THE COUNTY JAIL AND A FINE OF $500.00 IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE, P.J., IRVING, MYERS, CHANDLER, GRIFFIS, BARNES, AND ISHEE, JJ., CONCUR.

. During 2002 and 2003, a series of rapes and murders occurred in and around Baton Rouge, Louisiana. Bethany’s caller was probably referencing those crimes. On October 12, 2004, Derrick Todd Lee, charged as the perpetrator of those rapes and murders, was found guilty of capital murder in the death of Charlotte Murray Pace.