ROBERTS, J.,
for the Court:
¶ 1. A jury sitting before the Harrison County Circuit Court found Shirley Cumberland Taylor guilty of felony driving under the influence causing death or disfigurement in violation of Mississippi Code Annotated section 63-11-30(5) (Supp.2010). The circuit court sentenced Taylor to eighteen years in the custody of the Mississippi Department of Corrections. Aggrieved, Taylor appeals. Finding no error, we affirm.
FACTS AND PROCEDURAL HISTORY
¶ 2. At approximately 7:30 p.m. on January 8, 2008, William and Gail Kelly, who had been married for twenty-six years, were walking for exercise along Mark West Road in Harrison County, Mississippi. To make themselves more visible to drivers, Gail carried a flashlight, and William wore a vest with reflective material sewn into it.
¶ 3. As William and Gail walked south on Mark West Road, they saw headlights approaching in the opposite direction. According to Gail, she and William moved onto a private road that intersects Mark West Road. In so doing, William and Gail put a lane of traffic between themselves and the oncoming vehicle. Unfortunately, Taylor drove her 2007 GMC Sierra pickup truck across the oncoming lane of traffic and continued off of Mark West Road, where she hit William with the front of her pickup truck. At trial, Gail described that moment as follows: “[Taylor] sped up, crossed over Mark West Road, [and] came into the private drive. I grabbed my husband’s arm. I said[,][’]I think they’re coming at us,[’] and she took him down the road with her vehicle.”
¶ 4. Taylor carried William approximately 125 feet before William was thrown off of her hood. William did not survive. Gary Hargrove, the Harrison County Coroner, later testified that the cause of William’s death was “massive blunt force trauma to the head, neck, trunk[,] and the extremities.” Taylor stopped her car approximately 275 feet away from the place where William came to rest.
¶ 5. Gail first ran to the area where William came to rest. William was unresponsive. Gail then ran down the road to Taylor’s pickup truck. Gail asked Taylor whether she had a cell phone and, if she did, whether she would let Gail use it to call 911. According to Gail, Taylor said, “I do, it’s in my purse, and I don’t know where it’s at. And, if I knew where it was at, I wouldn’t let you use it.” Gail immediately ran home and called 911. She then drove back to the scene of the collision.
¶ 6. Deputy Ashley Megan Burge of the Harrison County Sheriffs Department was one of the first responders at the scene. Deputy Burge later testified that Taylor had alcohol on her breath; her eyes were red and “glassy”; she swayed when she was standing still; and her speech was slurred. Deputy Burge advised Taylor of her Miranda[1] rights. Taylor waived her right to remain silent and told Deputy Burge that she had consumed twelve beers that evening. Taylor also told Deputy Burge that she had been “driving down the road, [when] somebody flashed a light in her eyes and oops, there they were.” Deputy Burge administered a field sobriety test. Taylor performed poorly.
¶7. Deputy Burge placed Taylor into custody and obtained a search warrant to collect a blood sample from Taylor. According to Deputy Burge, while Taylor’s blood was being drawn, Taylor said, “she *304 hoped that she had killed that man.” Wendy Hathcock, a forensic scientist employed by the Mississippi Crime Laboratory, later testified that her analysis of Taylor’s blood sample revealed that Taylor’s blood-alcohol content was .22 percent on the night that Taylor killed William.
¶ 8. Authorities subsequently obtained a warrant to search Taylor’s pickup truck. Deputy Glenn Roe of the Harrison County Sheriffs Department recovered the “system diagnostic module,” colloquially known as a “black box,” from underneath the carpet on the driver’s side floorboard of Taylor’s pickup truck. According to the information stored on the black box, Taylor was driving fifty-seven miles per hour approximately one second before she hit William. The posted speed limit on Mark West Road was thirty miles per hour. The black box also indicated that Taylor did not hit her brakes before she killed William.
¶ 9. Taylor was indicted for “felony driving under [the] influence causing death or disfigurement.” Taylor waived arraignment and pled not guilty. On July 8, 2010, Taylor went to trial. The events that transpired during the trial will be examined in greater detail as necessary in the analysis portion of this opinion. To summarize, the prosecution called numerous witnesses, including Gail, Deputy Burge, Deputy Roe, and Hathcock. After the prosecution rested, Taylor chose to testify. According to Taylor, contrary to her statement to Deputy Burge that she had consumed twelve beers on the evening that she killed William, she actually had six beers. Taylor presented a receipt from the Two Miles North Lounge to corroborate her testimony. Taylor had the following explanation for hitting William: “Just as I got up to the houses on the right side, the light shined in my face and I couldn’t see. I felt an impact and I stopped a little ways down thinking I had hit a deer.” Taylor also testified that she was going around a pothole before she hit William.
¶ 10. Additionally, Taylor called numerous witnesses who testified that Mark West Road was in disrepair and that it lacked painted lane-divider lines. Taylor also called witnesses who testified that they had seen William and Gail walking down the center of Mark West Road, although none of those witnesses testified that William and Gail were walking down the center of the road on the night that Taylor killed William. During the prosecution’s rebuttal, Investigator Bill Haden of the Harrison County Sheriffs Department testified that the pothole nearest to the place where Taylor hit William was 528 feet away.
¶ 11. After deliberating for approximately one hour, the jury found Taylor guilty. The circuit court sentenced Taylor to eighteen years in the custody of the MDOC. Aggrieved, Taylor appeals.
ANALYSIS
I. SUFFICIENCY OF THE INDICTMENT
¶ 12. Taylor claims the circuit court erred when it denied her pretrial motion styled as a “motion to dismiss, quash or demur to the indictment.” Within that motion, Taylor claimed that the indictment did not sufficiently charge her with the essential elements of the charge. The circuit court heard Taylor’s motion on July 2, 2009.
¶ 13. During the hearing, Taylor argued that the indictment was defective because it did not contain any allegation as to the manner in which she was negligent. According to Taylor, the indictment alleged that she was negligent only in that she was intoxicated at the time she hit and killed William. Taylor further argued that *305 an indictment for DUI causing death or disfigurement must include an allegation as to the manner in which the accused was negligent, and negligence may not be based simply on the fact that the accused was intoxicated.
¶ 14. The circuit court denied Taylor’s motion. Specifically, the circuit court stated as follows:
The purpose of the indictment is to adequately inform the defendant of the charge against him or her in this case and to give notice of the specific charge that the [S]tate is going to proceed on. After reviewing these cases presented to the Court this morning, I am of the opinion that the indictment is legally sufficient to place the defendant on notice, especially in light of the fact of the District Attorney’s policy of full disclosure of its case and file in discovery. And I feel that the indictment is sufficient and has passed muster at the Supreme Court in the past. So I’m going to deny the motion to dismiss, quash or demurrer to the indictment.
On appeal, Taylor reiterates her claim that the indictment was insufficient. Because the legal sufficiency of an indictment is a question of law, we conduct a de novo review. Tran v. State, 962 So.2d 1237, 1240 (¶ 12) (Miss.2007)(citing Peterson v. State, 671 So.2d 647, 652 (Miss.1996) (superceded by statute)).
¶ 15. The purpose of an indictment is to satisfy the constitutional requirement that a “defendant be informed of the nature and cause of the accusation.” U.S. Const, amend. VI; Miss. Const, art. 3, § 26. See also URCCC. 7.06 (Indictment must include a “plain, concise and definite written statement of the essential facts constituting the offense charged and shall fully notify the defendant of the nature and cause of the accusation.”). Therefore, in order for an indictment to be sufficient, “it must contain the essential elements of the crime charged.” Peterson, 671 So.2d at 652-53 (citing May v. State, 209 Miss. 579, 584, 47 So.2d 887 (1950)). “It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as ‘those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.’ ” Tran, 962 So.2d at 1241 (¶17). “[T]he language of the statute may be used in the general description of an offence, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged.” Id. at 1241-42 (¶ 17).
¶ 16. “However, simply tracking the language of a statute will not always be sufficient.” Id. at 1242 (¶ 18). “[Wjhether an indictment in the language of the statute is sufficient, or whether other words or acts are necessary to properly charge the commission of a crime is dependent upon the nature of the offense and the terms in which it is described by the statute.” Id. The Mississippi Supreme Court has noted the following:
By way of analogy, this Court has clearly and consistently held that an indictment which simply follows the language of Mississippi’s burglary statute is insufficient. The crime of burglary of a dwelling has two elements: (1) the bur-glarious breaking and entering a dwelling, and (2) the felonious intent to commit some crime therein. Because the offense of burglary requires the State to prove the defendant broke into a dwelling with the intent to commit “some crime therein,” the indictment must specify the crime the accused intended ,to commit.
*306 Id. at (¶ 19) (internal citations omitted). In Tran, the Mississippi Supreme Court held that an indictment charging an accused with money laundering must inform the accused of the “unlawful activity” that allegedly produced .the funds he is accused of laundering. Id. at 1243 (¶ 23).
¶ 17. The supreme court found that the indictment in Tran was defective. Id. at 1246 (¶ 36). However, that finding did not end the supreme court’s analysis. Id. “Trial and appellate courts have the duty to be fair, not only to the defendant, but to the State as well.” Id. “Harmless-error analysis is often necessary to prevent unfair prejudice to the State, and the State is certainly prejudiced where convictions are reversed based on errors which do not affect the substantial rights of the parties.” Id. (citations omitted). “Harmless errors are only those ‘which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction.’ ” Id. at 1247 (¶ 37). “In conducting [a] harmless[-]error analysis, this Court has the power and duty to review the record de novo in order to determine the error’s effect.” Id.
¶ 18. The supreme court stated that it “must carefully examine the record to determine whether there was a violation of [the defendant’s] constitutional guarantee of fair notice and opportunity to prepare a defense.” Id. at (¶ 38). The supreme court’s examination of the record in Tran indicated that there were numerous means by which the defendant in that case received notice of the charges against him, and he was, therefore, afforded an opportunity to prepare a defense. Id. at 1247-48 (¶¶ 39-41). Accordingly, the supreme court held that “the omission of the ‘specified unlawful activity’ in the indictment to be harmless error which did not render the trial fundamentally unfair.” Id. at 1248 (¶ 42).
¶ 19. The supreme court clarified that it did not intend for its decision in Tran “to diminish the importance of the information required to be included in an indictment.” Id. at (¶ 43). The supreme court further stated that: “were it not for the abundance of evidence in the record that [the defendant] had fair notice and an opportunity to prepare a defense, his constitutionally-infirm indictment would require that we reverse his conviction.” Id.
¶ 20. The indictment against Taylor reads as follows:
SHIRLEY CUMBERLAND TAYLOR[,] in the First Judicial District of Harrison County, Mississippi, on or about January 8, 2008[,] did unlawfully, willfully, and feloniously, drive or operate a motor vehicle within Harrison County, State of Mississippi, while under the influence of intoxicating liquor, and did thereby in a negligent manner cause the death of William H. Kelly, a human being, in violation of Section 63-ll-30(l)(a) and (5), contrary to the form of the statute in such cases made and provided, and against the peace and dignity of the State of Mississippi.
During the hearing on Taylor’s motion, Taylor’s attorney admitted the following:
The discovery shows the possibility of two specific negligent acts. One, of course, is driving on the wrong side of the road. And the other one is driving at a higher rate of speed than what was permitted. I think the posted speed limit of 30, and the speed of 53 to 57 according to the accident reconstructionist.
Assuming, for the sake of discussion, that the indictment was insufficient in that it did not allege a specific basis for Taylor’s negligence, any error that resulted would *307 be harmless. To be clear, we do not find that an indictment for felony driving under the influence causing death or disfigurement is or is not required to allege a specific basis for an allegation of negligence. In light of the supreme court’s decision in Tran, we do not find that the circuit court erred when it held that Taylor had notice of the basis for the negligence charged in the indictment. Taylor’s attorney admitted that he was aware that the prosecution was going to argue that Taylor was negligent at the time she hit and killed William in that she was: (1) driving on the wrong side of the road, and (2) she was driving twenty-three to twenty-seven miles per hour over the posted speed limit. Accordingly, we find no merit to this issue.
II. WAIVER OF TAYLOR’S RIGHT TO REMAIN SILENT
¶ 21. In this issue, Taylor argues that the circuit court erred when it allowed Deputy Burge to testify regarding statements that Taylor gave after having been informed of her right to remain silent. Taylor claims that she was too intoxicated to have knowingly and voluntarily waived her right to remain silent. We are mindful that: ‘Whether there was an intelligent, knowing and voluntary waiver is a factual question to be determined by a trial court from the totality of the circumstances.” Martin v. State, 854 So.2d 1004, 1007 (¶ 4) (Miss.2003). We will only reverse a circuit court’s “determination of voluntariness if convinced that such a finding is manifestly wrong and/or against the overwhelming weight of the evidence.” Id.
¶ 22. Deputy Burge testified that she approached William immediately after she arrived at the scene of the collision. When Deputy Burge approached Taylor, she “immediately noticed an odor of intoxicating beverage coming from Ms. Taylor’s breath and person. [Deputy Burge] noticed [that Taylor] had red glassy eyes. She had slurred speech, and she also was swaying while standing still.” According to Deputy Burge, she “immediately advised Ms. Taylor of her Miranda rights.” Deputy Burge went on to testify that Taylor waived her Miranda rights and “agreed to talk with [her] without the presence of a lawyer.” Deputy Burge then “asked Ms. Taylor what had happened.” As Deputy Burge began to testify that Taylor “stated that she was driving down the road[,]” Taylor’s attorney asked to approach the bench. The bench conference was not reported in the trial transcript. However, the next entry in the transcript is a notation that the jury exited the courtroom.
¶ 23. With the jury outside of the courtroom, Taylor objected and argued that the prosecution had stipulated that it would not attempt to solicit any testimony regarding statements that Taylor had made to law-enforcement officers prior to receiving the standard Miranda warnings. The circuit court overruled Taylor’s objection and noted that Deputy Burge had testified that she had read Taylor her rights under Miranda and that Taylor had waived her right to remain silent. The jury returned to the courtroom, and the prosecution proceeded with its direct examination of Deputy Burge.
¶ 24. The prosecution then asked a few questions regarding the manner in which Deputy Burge informed Taylor of her rights. Deputy Burge again testified that Taylor waived her right to remain silent. When Deputy Burge began to testify regarding Taylor’s specific statements after having waived her right to remain silent, Taylor’s attorney objected again. During a bench conference, Taylor’s attorney argued for the first time that Taylor had been too intoxicated to have knowingly and voluntarily waived her right to remain silent. The jury again exited the courtroom.
*308 ¶ 25. Outside of the presence of the jury, the prosecution proffered testimony from Deputy Burge. During that proffer, Deputy Burge testified that she had been in her uniform at the time she spoke to Taylor. Deputy Burge also testified that Taylor recognized the fact that she was speaking with a law-enforcement officer. According to Deputy Burge, Taylor was responsive, and although Taylor appeared to be intoxicated, she was also “oriented to place and time,” and she did not have any difficulty understanding Deputy Burge. Taylor responded appropriately to Deputy Burge’s preliminary questions regarding Taylor’s name and date of birth. Deputy Burge further testified that she did not force Taylor to respond to her questions and that neither she nor anyone in her presence promised to reward Taylor if Taylor waived her right to remain silent. Deputy Burge went on to testify that, in her opinion, Taylor had freely and voluntarily waived her right to remain silent. Finally, Deputy Burge testified that, although she believed that Taylor was impaired at the time, she did not believe that Taylor had provided her with any false information.
¶ 26. During the proffer, Taylor’s attorney cross-examined Deputy Burge. Taylor’s attorney had Deputy Burge testify that: Taylor was swaying; she could not support herself; she “wreaked” of alcohol; and every field sobriety test that Deputy Burge administered indicated that Taylor was intoxicated.' Taylor’s attorney then asked Deputy Burge whether Taylor was able to function “as a normal person.” Deputy Burge responded as follows:
She was impaired, but I have seen people who[,] upon being impaired[,] were not capable of functioning. There are times when I attempted to read someone their Miranda rights and they could not answer if they understood their rights, and I could not ask them questions because of that. Ms. Taylor was not that impaired to that point, to the point where she did not understand what was going on.
Taylor’s attorney asked Deputy Burge whether Taylor’s blood-alcohol content was three times the legal limit. Taylor responded affirmatively. The circuit court then held as follows:
[Deputy Burge] has testified that she gave the Miranda warnings to the defendant, who understood her questions, was able to respond to her questions, and was not impaired to the extent that she could not waive her rights. So I’m going to overrule the objections and rule that the defendant knowingly and voluntarily waived her Miranda rights at the time this officer questioned her.
Taylor’s attorney then asked Deputy Burge about a form that did not include Taylor’s signature, which indicated that she had been advised of her Miranda rights. Deputy Burge explained as follows:
That is a form that I fill out upon arriving at the jail to document the DUI tests that the subject I brought to jail has taken. I have never had a subject sign their Miranda on that form because I don’t explain their Miranda rights to them at that point. I simply use that form to document what time I gave them the Miranda warnings.
¶ 27. After a short break, the circuit judge noted that Taylor’s “objection to this officer’s testimony has basically turned into a motion to suppress.” The circuit judge offered Taylor’s attorney an opportunity to “cross-examine this officer from the standpoint of it being a motion to suppress, rather than from your objection as earlier stated, and we’ll just have a suppression hearing right now.” Taylor’s attorney announced that he did not think *309 “there [was] anything extra to bring out on that motion to suppress.” The circuit judge then stated that “for the reasons that [he] previously expressed [he was] going to deny the motion to suppress.”
¶ 28. After the jury returned to the courtroom, Deputy Burge testified as follows:
I asked Ms. Taylor how much she had had to drink. She stated she had twelve beers to drink that evening. She stated that — I have people rate themselves on a scale of one to ten, one being completely sober and ten being just completely intoxicated or passing out, to rate herself on a scale of one to ten for her intoxication level, she stated that she was a four. Ms. Taylor also stated she undoubtedly did not believe that she should be driving that evening. When I asked her to describe what happened in the accident, she stated she was driving down the road, somebody flashed a light in her eyes and oops, there they were.
Deputy Burge also testified that, while they were at the hospital to have her blood drawn, Taylor “stated that she hoped that she had killed that man.” According to Deputy Burge, Taylor “stopped speaking at that point.”
¶29. According to Taylor, the circuit court erred when it held that Taylor had knowingly and intelligently waived her right to remain silent. “Once the trial judge has determined that a confession is admissible, the defendant has a heavy burden in attempting to reverse that decision on appeal.” Baggett v. State, 793 So.2d 630, 634 (¶ 7) (Miss.2001). “When the trial court has overruled a motion to suppress a defendant’s confession, we will reverse the trial court’s decision only if the trial court’s ruling is manifest error or contrary to the overwhelming weight of the evidence.” Morris v. State, 913 So.2d 432, 434 (¶ 5) (Miss.Ct.App.2005) (citing McGowan v. State, 706 So.2d 231, 235 (¶ 11) (Miss.1997)). “In other words, this Court will not reverse a trial court’s finding that a confession was voluntary and is admissible as long as that trial court applied the correct principles of law and its finding was factually supported by the evidence.” Id. (citing Haymer v. State, 613 So.2d 837, 839 (Miss.1993)).
¶ 30. “Intoxication does not automatically render a confession involuntary. However, the degree of intoxication is a matter which may be considered by the court in making its determination as to whether a statement should be suppressed.” Id. at (¶ 7) (citing O’Halloran v. State, 731 So.2d 565, 571 (¶18) (Miss.1999)). Furthermore, the Mississippi Supreme Court has stated:
With respect to the effect of intoxication on the voluntariness of a confession, this Court has held that where the defendant was in “an acute, rampant state of intoxication equivalent to mania,” any waiver of constitutional rights could not be voluntary and intentional and the defendant’s statement should be excluded.
Stevens v. State, 458 So.2d 726, 728 (Miss.1984) (quoting State v. Williams, 208 So.2d 172, 175 (Miss.1968)).
¶ 31. The circuit court gave Taylor’s trial counsel an opportunity to present additional testimony during the hearing. Nevertheless, Taylor’s trial counsel did not call Taylor or any other witness who testified that Taylor was too intoxicated to have knowingly, intelligently, and voluntarily waived her right to remain silent. At the time the circuit court made its ruling, it had heard testimony from one witness — Deputy Burge. Deputy Burge testified that Taylor was not so impaired that she could not knowingly, intelligently, and voluntarily waived her right to remain silent. In Kemp v. State, 352 So.2d 446, *310 448 (Miss.1977), the Mississippi Supreme Court held that a confession was admissible despite the fact that a defendant had been “drinking heavily.” The supreme court noted that law-enforcement officers had testified that the defendant in Kemp “was in control of his faculties.” Id. Here, the only evidence before the circuit court when it made its ruling was that Taylor was responsive, “oriented to place and time,” did not have any difficulty understanding Deputy Burge, responded appropriately to preliminary questions about her name and date of birth, and had freely and voluntarily waived her right to remain silent. Because the circuit court’s decision was factually supported by the undisputed evidence and was not in manifest error, we find no error in the circuit court’s decision to overrule Taylor’s motion to suppress.
III. EVIDENCE FROM THE BLACK BOX
¶ 32. Taylor raises four separate issues that all focus on the concept that the circuit court should have prohibited the prosecution from presenting evidence from the black box that had been in Taylor’s pickup truck. Taylor claims the circuit court should have prohibited the introduction of that evidence because: (1) the black box was outside the scope of the search warrant; (2) the data within the black box was, therefore, the “fruit of the poisonous tree”; (3) Deputy Roe should not have been allowed to authenticate the report; and (4) Deputy Roe’s presented improper opinion testimony about the black-box report. “The standard of review regarding the admission or exclusion of evidence is abuse of discretion.” Lattimer v. State, 952 So.2d 206, 215 (¶24) (Miss.Ct.App.2006). “Abuse of discretion will only be found where a defendant shows clear prejudice resulting from an undue lack of constraint on the prosecution or undue constraint on the defense.” Id.
1. SEIZURE OF THE BLACK BOX
¶ 33. Taylor argues that the black box was outside the scope of the search warrant that authorities obtained. The search warrant issued by the Harrison County Justice Court reads as follows:
items to be searchfed] for include, but are not limited to: blood, hair, pieces of human flesh/tissue, parts of clothing, and items that may have transferred to the vehicle after contact with victim William Kelly. To include items inside the vehicle such as, both prescribed and illegal narcotics, beer, liquor or substances that would impair the driver of the vehicle.
After the jury had been selected, but before opening statements, Taylor raised an ore tenus motion regarding the admissibility of the black box and the evidence derived from it. After hearing Taylor’s motion, the circuit court held that the black box and the evidence derived from it were both admissible. According to the circuit court, the “black box ... was encompassed by the search warrant.”
¶ 34. The Fourth Amendment to the United States Constitution and Article 3, Section 23 of the Mississippi Constitution provide that an individual has the right to be free from unreasonable searches and seizures. Dies v. State, 926 So.2d 910, 917-18 (¶ 21) (Miss.2006). Evidence, however relevant and trustworthy, obtained from an illegal arrest or detention is inadmissible at trial. Davis v. Mississippi, 394 U.S. 721, 724, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969).
¶ 35. The United States Supreme Court has held that a search warrant must describe with particularity the place to be searched and the things to be seized. Groh v. Ramirez, 540 U.S. 551, 556, 124 S.Ct. 1284, 157 L.Ed.2d 1068 *311 (2004). “The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.” Marron v. United States, 275 U.S. 192, 196, 48 S.Ct. 74, 72 L.Ed. 231 (1927). The particularity requirement assures that the magistrate approves the scope of the search and that the person whose property is being searched can also ascertain that scope. See, e.g., Groh, 540 U.S. at 557, 124 S.Ct. 1284. Once the articles particularly described in the warrant are discovered and seized, the search must cease. Horton v. California, 496 U.S. 128, 141, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990).
¶36. Taylor concedes that the search warrant was reasonable at its inception. Taylor’s argument is based on the premise that the search warrant authorized the seizure of two “strictly limited” types of evidence: “biological evidence on the outside of the vehicle, linking Taylor’s vehicle to [William] ... and evidence in the inside of the vehicle attempting to show that Taylor was intoxicated at the time of the incident.” Taylor argues that: “Respectfully, there is no way that an officer, reading the language of the warrant in question, could reasonably think that he or she would be allowed to cut open the floorboard of Taylor’s vehicle, and remove the black box.”
¶ 37. The State argues that the search warrant should not be interpreted as pertaining to only two categories of potential evidence. The State points out that the search warrant stated that “items to be search[ed] for include, but are not limited to” the items that were expressly stated in the search warrant. According to the State, the language in the search warrant should be interpreted as including any data stored in the black box that demonstrated: (1) Taylor was intoxicated at the time she hit and killed William, or (2) Taylor was driving in a negligent manner when she hit and killed William.
¶ 38. The search warrant specifically stated that the resulting search was “[t]o include items inside the vehicle.” We do not interpret the language in the search warrant as authorizing the seizure of two strictly limited categories of evidence, as Taylor argues. Instead, we interpret the search warrant as authorizing the seizure of any evidence that tended to demonstrate that Taylor was intoxicated at the time she hit and killed William. The black box and the data within it contained information that would assist in that regard. We find no merit to this issue.
2. THE DATA WITHIN THE BLACK-BOX
¶ 39. Taylor’s second argument pertains to the admissibility of the data within the black box. Her argument is grounded on the concept that, because the black box was not within the scope of the search warrant, the data within the black box should be excluded from evidence as “fruit of the poisonous tree.” However, we have determined that there is no merit to Taylor’s argument regarding the seizure of the black box. It follows that there is no merit to this assignment of error.
3. AUTHENTICATION OF THE BLACK BOX REPORT
¶40. Taylor further argues that the data within the black box should not have been admissible because Deputy Roe did not properly authenticate the report. Taylor notes that Deputy Roe testified that Deputy Brett Alexander extracted the data report from the black box. The data report is a one-page document that listed *312 the speed of Taylor’s vehicle per second for the five seconds prior to the time that Taylor hit and killed William, the status of the brake switch circuit, and the number of ignition cycles at the time of the accident. Although he did not personally extract the data from the black box, Deputy Roe testified that he personally observed Deputy Alexander extract the data. However, Taylor claims that, because Deputy Roe did not personally extract the data from the black box, the circuit court erred when it allowed him to authenticate the data. We disagree.
¶ 41. Mississippi Rule of Evidence 901(a) provides that: “The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.” Rule 901(b)(1) sets forth that one example of a means to authenticate evidence is through the testimony of a witness with knowledge “that a matter is what it is claimed to be.” M.R.E. 901(b)(1). Deputy Roe testified that he was present when Deputy Alexander extracted the data from the black box. Accordingly, Deputy Roe had personal knowledge that the report was “what it [was] claimed to [have been].” It follows that the black-box report was properly authenticated. We, therefore, find no merit to this issue.
4. OPINION TESTIMONY
¶42. Finally, Taylor claims the circuit court erred when it allowed Deputy Roe to testify, over objection, as to his lay opinion regarding the black box and the information contained within it. Deputy Roe testified that the black box “constantly ... monitors all the systems of the vehicle.” Taylor objected and argued that Deputy Roe was “not an expert and doesn’t know as to how the operation actually takes place.” The prosecution argued that Deputy Roe would not need to testify as an expert witness to “give an overview of what the system does, it’s [sic] purpose and how it captures the information in layman’s terms.” The circuit court overruled Taylor’s objection.
¶43. Taylor claims the circuit court erred. According to Taylor, Deputy Roe’s opinion testimony required that he be designated as an expert witness. Taylor reasons that, without having been so designated, Deputy Roe’s opinion testimony was inadmissible. However, Taylor does not specifically argue that any particular portion of Deputy Roe’s testimony was inadmissible. Instead, she draws our attention to nine pages of the trial transcript.
¶ 44. Within those nine pages of the transcript, Deputy Roe first testified as to general matters regarding the means by which one extracts the data from a computer and the general aspects of the data. Deputy Roe testified that: (1) one recovers the data from the black box by connecting a cable between the black box and a computer; (2) the data recovered from the black box can be “readily read and understandable]”; (3) ho scientific knowledge is required to interpret the data; (4) the data is in plain English; and (5) the data is not subject to manipulation.
¶ 45. Deputy Roe then testified regarding the particular aspects of the report from the black box that was recovered from Taylor’s pickup truck. Deputy Roe testified that the report contained the following information: (1) Taylor’s air bags did not deploy; (2) there had been more than 2,500 “ignition cycles” since the pickup had been manufactured; (3) five seconds before Taylor hit and killed William, her pickup truck was traveling at fifty-two miles per hour; (4) four seconds before the collision, Taylor was traveling at the same speed; (5) three seconds before the colli *313 sion, Taylor was traveling at fifty-four miles per hour; (6) two seconds before the collision, Taylor was traveling at fifty-five miles per hour; (7) one second before the collision, Taylor was traveling at fifty-seven miles per hour; and (8) during the eight seconds immediately before the collision, the brakes on the pickup truck had not been activated.
¶ 46. In the nine pages of the transcript that Taylor references, Deputy Roe merely testified regarding the means by which one extracts data from the black box and the information that was contained within the report. Aside from his opinions that the data was readily understandable, in plain English, and that no scientific knowledge was required to interpret the data, no portion of the referenced testimony that could be interpreted as prejudicial to Taylor required that Deputy Roe form an opinion — much less that he testify regarding an opinion. It follows that Deputy Roe’s testimony cannot be characterized as impermissible expert opinion testimony by a lay witness. Consequently, we find no merit to this issue.
IY. DESTRUCTION OF TAYLOR’S BLOOD SAMPLE
¶ 47. Taylor takes issue with the fact that her blood sample was not preserved for trial. “The State has the duty to preserve evidence, but that duty is limited to that evidence which might be expected to play a significant role in the suspect’s defense.” Cox v. State, 849 So.2d 1257, 1266 (¶ 24) (Miss.2003). The Mississippi Supreme Court has held:
When a defendant claims he is entitled to a new trial based on the prosecution’s having lost or destroyed evidence, we employ a two-part test: First, it must be determined whether the evidence would have played a significant role in the defendant’s case. To play a significant role, the exculpatory nature and value of the evidence must have been apparent before the evidence was lost. The second part of the test requires that the defendant have no way of obtaining comparable evidence by other means.
Id. at (¶ 25).
¶ 48. Under circumstances in which evidence has been destroyed, intentionally a presumption or inference arises that the evidence would have been unfavorable to the case of the party who de- • stroyed the evidence. Id. at (¶ 26). However, that presumption or inference does not arise “where the destruction was a matter of routine with no fraudulent intent.” Id. “[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.” Id. at (¶ 27).
¶ 49. There was no evidence of bad faith on the part of the Mississippi Crime Laboratory. Hathcock testified that she destroyed the blood sample ten months after testing it because the laboratory protocol dictates that, unless requested otherwise, all evidence is disposed of six months after testing. According to Hathcock, “all samples submitted for toxicological examination will be routinely disposed of six months after analyses are complete.” Therefore, the disposal of Taylor’s blood sample was handled in a routine manner. It follows that the presumption that the evidence would have been unfavorable to the prosecution does not arise. Furthermore, there is no evidence that the first part of the two-part test was satisfied. That is, it cannot be determined that Taylor’s blood sample would have played a “significant role” within the meaning of the two-part test discussed above, because there was no evidence that the blood sample was of an “exculpatory nature.” Taylor’s blood sample indicated that she had a *314 blood-alcohol content of .22 percent. It cannot be said that it tended to exculpate Taylor. We find no merit to this issue.
V. SUFFICIENCY OF THE EVIDENCE
¶ 50. In this issue, Taylor claims the evidence against her was insufficient to find her guilty of felony driving under the influence causing death or disfigurement. “A motion for a judgment notwithstanding the verdict is a challenge to the sufficiency of the evidence.” Gilbert v. State, 934 So.2d 330, 335 (¶ 9) (Miss.Ct.App.2006). As our Mississippi Supreme Court has stated:
in considering whether the evidence is sufficient to sustain a conviction in the face of a motion for [a] directed verdict or for [a] judgment notwithstanding the verdict, the critical inquiry is whether the evidence shows beyond a reasonable doubt that accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.... [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Should the facts and inferences considered in a challenge to the sufficiency of the evidence point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty, the proper remedy is for the appellate court to reverse and render.
Bush v. State, 895 So.2d 836, 843 (¶ 16) (Miss.2005) (internal citations and quotations omitted). However, this Court will determine that there was sufficient evidence to sustain the jury’s verdict if the evidence was “of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense[.]” Id. (internal citations and quotations omitted).
¶ 51. “[T]he crime of vehicular homicide requires not only that the defendant became intoxicated before the accident but also that he performed a negligent act that caused the death of another. The negligence need not have been caused by the alcohol consumption.” Dunaway v. State, 919 So.2d 67, 71 (¶ 11) (Miss.Ct.App.2005) (citing Joiner v. State, 835 So.2d 42, 43-44 (¶ 5) (Miss.2003)). Along with sufficient evidence that the accused was driving under the influence when he or she caused the death or disfigurement of another person, simple negligence is enough to support a conviction under section 63-11-30(5). Murphy v. State, 798 So.2d 609, 615 (¶ 24) (Miss.Ct.App.2001) (citing Holloman v. State, 656 So.2d 1134, 1140 (Miss.1995)). Simple negligence has been defined as the “failure to exercise reasonable care under the circumstances.” Id.
¶ 52. Taylor argues that the evidence failed to demonstrate that she had committed a negligent act. Taylor draws our attention to the evidence regarding the condition of Mark West Road. In particular, Taylor notes that there was testimony that there was no center line painted on the road, and the road surface was deteriorated to some extent. Taylor also argues that the Kellys’ own behavior precludes the possibility that Taylor could have been negligent. Taylor acknowledges that Gail testified that she and William were on the side of Mark West Road when Taylor hit and killed William. Taylor then notes that Gail was the only person who testified that *315 she and William were standing off of Mark West Road when Taylor killed William. Taylor goes on to state that: “Numerous other witnesses testified that it was common for the Kellys to walk in the middle of the road.” However, there was no testimony that William was walking down the middle of Mark West Road when Taylor killed him. Furthermore, Gail’s testimony, standing alone, is sufficient evidence for the jury to conclude that William was standing off of Mark West Road when Taylor killed him. “The testimony of a single uncorroborated witness is sufficient to sustain a conviction even though there may be more than one person testifying to the contrary.” Smith v. State, 956 So.2d 997, 1004 (¶ 18) (Miss.Ct.App.2007).
¶ 53. Taylor’s arguments also fail in that they rely on a conclusion that other factors — in the form of the condition of the road or William’s own behavior — preclude the possibility that she could have been driving in a negligent manner. “[T]he State does not have to prove that there were no other negligent causes, merely that the negligence of the defendant was a cause.” Id. at 1007 (¶ 34). Taking the evidence and all reasonable inferences therefrom in the light most favorable to the State, there certainly was sufficient evidence that Taylor’s negligent driving caused William’s death. It was undisputed that Taylor was driving the pickup truck when it hit William. Furthermore, the jury could have reasonably concluded that Taylor was driving in a negligent manner when she killed William. In Smith, this Court held that the fact that a collision occurred in a victim’s lane of travel weighed in favor of finding that the jury’s verdict of guilt was supported by sufficient evidence. Id. at 1004 (¶ 19). In this ease, there was evidence that Taylor left her lane of travel, drifted left into the opposite lane, and continued to drift left off of Mark West Road, where she hit and killed William as he stood off of Mark West Road. Accordingly, there was ample evidence to support the jury’s verdict. We find that this issue is meritless.
VI. WEIGHT OF THE EVIDENCE
¶ 54. Taylor claims the verdict is contrary to the overwhelming weight of the evidence. The basis for Taylor’s argument under this issue is the same as her basis for her argument regarding the sufficiency of the evidence. Taylor argues that the overwhelming weight of the evidence indicated that she did not commit a negligent act.
¶ 55. “A motion for new trial challenges the weight of the evidence.” Dilworth v. State, 909 So.2d 731, 737 (¶ 20) (Miss.2005). A motion for new trial “is addressed to the discretion of the court, which should be exercised with caution, and the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict.” Smith, 956 So.2d at 1003 (¶ 16). “A reversal is warranted only if the lower court abused its discretion in denying a motion for new trial.” Dilworth, 909 So.2d at 737 (¶ 20).
¶ 56. As we review the circuit court’s decision to deny a motion for new trial, we must view the evidence in a light most favorable to the verdict. Id. at (¶ 21). We will reverse the circuit court’s decision “only when the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” Smith, 956 So.2d at 1003 (¶ 16).
¶ 57. For the reasons stated above, we do not find that it would sanction an unconscionable injustice to allow Taylor’s conviction to stand. Viewing the evidence in the light most favorable to the verdict, there was significant evidence that Taylor *316 was under the influence of alcohol and driving in a negligent manner when she killed William. We find no merit to this issue.
VII. CUMULATIVE EFFECT OF ERRORS
¶ 58. Taylor claims that this Court should grant her a new trial based on the cumulative effect of the errors at trial. “[I]ndividual errors, not reversible in themselves, may combine with other errors to make up reversible error.” Wilburn v. State, 608 So.2d 702, 705 (Miss.1992). However, we have found no errors. It follows that there can be no cumulative effect that would require awarding Taylor a new trial.
¶ 59. THE JUDGMENT OF THE HARRISON COUNTY CIRCUIT COURT OF CONVICTION OF FELONY DRIVING UNDER THE INFLUENCE CAUSING DEATH AND SENTENCE OF EIGHTEEN YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HARRISON COUNTY.
LEE, C.J., IRVING AND GRIFFIS, P.JJ, ISHEE AND CARLTON, JJ., CONCUR. BARNES AND MAXWELL, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. MYERS, J., NOT PARTICIPATING.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).